IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 23-00182-01-CR-W-BP |
| | ) | |
| CHARLES S. BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending is Defendant Charles S. Brown's Motion to Suppress Evidence and Statements, which was filed on December 4, 2023. Doc. 21. For the reasons set forth below, the undersigned recommends Defendant's motion to suppress be granted.

## I.        BACKGROUND

On August 16, 2023, the grand jury returned an indictment charging Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Doc. 1. The charge involves a firearm law enforcement seized from Defendant on March 22, 2023. *Id.* On December 4, 2023, Defendant filed a motion seeking to suppress, among other things, the seized firearm. Doc. 21.

On February 12, 2024, the undersigned held an evidentiary hearing on Defendant's motion. Docs. 29, 31. Defendant was present and represented by counsel, Assistant Federal Public Defender Ronna Holloman-Hughes. *Id.* Assistant United States Attorney Mike Green represented the Government. *Id.* At the hearing, one witnesses testified: Harold Echols. *Id.* In addition, ten exhibits were admitted. Doc. 29-31.

## II.    FINDINGS OF FACT

1.      At approximately 6:30 p.m. on March 22, 2023, Officer Harold Echols[1] with the Independence, Missouri Police Department ("IPD") received a phone call from IPD Detective Lonnie Pfeiffer.[2]  Hearing Transcript (hereinafter, "Tr.") (Doc. 31) at 4, 7-9, 34.  Detective Pfeiffer informed Officer Echols that as he was driving by the Staybridge Motel's parking lot, he observed the driver of a white pickup truck rummaging through another truck's bed.  Tr. at 9, 13, 34-37.  The white pickup truck's (hereinafter, "truck") license plates were covered with duct tape, and the driver, a white male, was wearing a surgical mask.[3]  Tr. at 9, 35-36.  Detective Pfeiffer asked for Officer Echols's assistance in contacting and identifying the driver and "see[ing] if he was possibly responsible for some of the other break-ins in the area."  Tr. at 9.  Detective Pfeiffer did not indicate to Officer Echols that he saw Defendant take anything from or break into the truck.  Tr. at 36.

2.      The Staybridge Motel is located half a block away from Officer Echols's office, which is a police substation attached to the Independence Center Shopping Mall.  Tr. at 5, 7.  Crimes commonly occurring near his office are shoplifting and property crimes.  Tr. at 5-6.  Officer Echols knew vehicle break-ins had occurred in parking lots in the area, including in Staybridge Motel's parking lot.  Tr. at 6, 9.

3.      Detective Pfeiffer followed the truck to QuikTrip on 39th Street[4] in Independence, which is roughly two or three blocks from the Staybridge Motel.  Tr. at 10, 12.  The driver, later

---

[1] For the past thirty years, Officer Echols has been employed with the Independence, Missouri Police Department.  Tr. at 4-5.  Officer Echols has been assigned to the Community Services Unit for roughly twenty years; his duties include handling service calls and addressing nuisance properties.  Tr. 5-6.  Before his law enforcement career, he worked loss prevention for retail stores.  Tr. at 6.

[2] Detective Pfeiffer also works as a Task Force Officer with the Drug Enforcement Administration.  Tr. at 8.  To avoid confusion, the Court refers to him as Detective Pfeiffer.  The Court also notes the various spellings of Detective Pfeiffer's last name.  *See* Docs. 28, 31.  The Court utilizes the spelling provided by Officer Echols.  Tr. at 9.

[3] Officer Echols described the mask as a COVID or surgical mask.  Tr. at 25, 35.  The Court refers to it as a surgical mask.

[4] During the hearing, Officer Echols was unsure about the cross street being Bolger or Viking.  Tr. at 10.

identified as Defendant, parked his truck near a gas pump. Tr. at 31, 36. Defendant then removed the duct tape from the license plates. Tr. at 12, 31, 36. The truck's license plate number was provided to dispatch. Tr. at 12, 36-37.

4.      As Officer Echols was driving to the QuikTrip, dispatch stated the truck was registered to Defendant with an address of 1519 South Appleton. Tr. at 12-14, 37, 39, 47; Gov't Ex. 1 at 18:41:07 – 18:41:21.[5] Dispatch also mentioned something about "a lot of suspicious activity on Appleton." Gov't Ex. 1 at 18:41:17 – 18:41:21.[6]

5.      Officer Echols recognized the address because he received complaints from neighbors and other officers about stolen automobiles at the address, stolen items being recovered from the property, disturbances at the property, and police pursuits from the address. Tr. at 14-15, 38, 50, 52. In fact, he testified he recognized the address dispatch provided because he "was in the process of dealing with that address." Tr. at 52. Officer Echols, however, admitted he had never been to the address, and he was not familiar with Defendant. Tr. at 37-38, 53. Officer Echols could not recall that any of the complaints regarding the address involved Defendant or any other specific person. Tr. at 53.

6.      At 6:41 p.m., Officer Echols arrived at the QuikTrip in his patrol car. Tr. at 10-12; Gov't Ex. 1 at 18:41:29 – 18:41:49. When Officer Echols arrived, Defendant was inside. Tr. at 15. At 6:42 p.m., Officer Echols entered QuikTrip.[7] Tr. at 17-18; Gov't Ex. 1 at 18:42:18 – 18:42:19.

---

[5] Officer Echols's patrol car was equipped with a dash camera, which recorded his arrival at QuikTrip and the video of his interactions with Defendant outside of QuikTrip. Tr. at 10-11; Gov't Ex. 1. There is no audio recording, however, of his interactions with Defendant outside the patrol vehicle. *See* Gov't Ex. 1.

[6] This portion of the dash camera recording was not discussed by the parties during the hearing, and the recording's audio is not clear. The Court was able to discern the portion cited in the above finding of fact.

[7] Once Officer Echols entered QuikTrip, his body mic should have recorded the encounter with Defendant. Tr. at 17-18. Officer Echols, however, testified his body mic did not record the encounter, and he was unsure why it was not operational. Tr. at 18.

He walked to the left portion of the store and contacted Defendant.[8] Tr. at 18; Gov't Ex. 1 at 18:42:19 – 18:42:26. At the time, Defendant had food in his hand and was standing near the fountain drink area and a cookie display. Tr. at 19, 40-42, 44. Officer Echols observed Defendant had a mask, although, during the hearing, he could not recall if the mask was covering Defendant's face. Tr. at 46-47. Officer Echols informed Defendant of the reason for the contact and the information he received from Detective Pfeiffer. Tr. at 19, 42-43. According to Officer Echols, Defendant "started to argue about the calls for service or the reason why." Tr. at 19.

7. At that point, Officer Echols asked Defendant if he had any weapons on his person, and Defendant stated he had none. Tr. at 19. During the hearing, Officer Echols testified he asked Defendant if he could do a quick frisk to ensure there were no weapons. Tr. at 19. However, Officer Echols also agreed with Government counsel's depiction of what transpired – that is, he "advised" Defendant that he was "going to frisk him for weapons." Tr. at 21.[9] According to Officer Echols, Defendant "never said anything that was counter to [the officer] making the request or even wanting to frisk" him, was cooperative, allowed the officer to frisk him for weapons, did not have a problem with being frisked, did not protest or say no, and never said anything indicating opposition to the frisk. Tr. at 19, 21, 43.

8. Officer Echols testified he had multiple reasons for wanting to frisk Defendant. Tr. at 19-20. First, Defendant was observed rummaging through another truck's bed in the Staybridge motel parking lot. Tr. at 9, 19-20. While rummaging through the other truck's bed, Defendant's license plates were covered with duct tape, and he was wearing a surgical mask. Tr. at 19-20. This

---

[8] Officer Echols testified he knew he was looking for a white male wearing a white jacket. Tr. at 16, 35.

[9] Based on the testimony provided, it is unclear if Officer Echols asked Defendant if he could frisk him, or if he told Defendant that was going to frisk him. Tr. at 19, 21. Neither party argues Defendant consented to a frisk of his person. *See* Docs. 21, 24. Thus, the inconsistent testimony is inconsequential to the undersigned's consideration of the pending motion.

information led Officer Echols to believe Defendant was "car prowling," which is often directly related to breaking into and/or stealing vehicles. Tr. at 19-21. Second, Defendant was associated with an address known for suspicious and criminal activities, and stolen vehicles were recovered from the address. Tr. at 19-20. Third, Officer Echols testified he "sustained life-altering injuries not frisking people, not detaining people appropriately." Tr. at 20. Finally, when approaching an individual inside a store who was suspected of engaging in possible criminal activity, it was Officer Echols's "practice" to frisk the individual. Tr. at 21.

9. Officer Echols frisked Defendant and found no weapons. Tr. at 21-22, 43, 45. However, he felt and recognized the crinkle of a cellophane wrapper in the front pocket of Defendant's hoodie. Tr. at 22, 43-44. According to Officer Echols, the wrapper was identical to an oversized cookie Defendant had in his hand. Tr. at 22. Although Defendant said he was going to pay for the cookie, Officer Echols believed Defendant was in the process of shoplifting. Tr. at 22-23, 44-45. He handcuffed Defendant for officer safety, to prevent Defendant from leaving, and to await the arrival of additional officers. Tr. at 23-24, 43, 45-46. According to Officer Echols, Defendant was "detained" at that time. Tr. at 23, 45. Officer Echols also removed the cookie from Defendant's pocket. Tr. at 22-23, 43-44.

10. During his interaction with Defendant inside QuikTrip, Officer Echols was not aware of Detective Pfeiffer's location. Tr. at 24, 45-46. He believed he was the only officer in Defendant's immediate vicinity. Tr. at 24.

11. At 6:43 p.m., Officer Echols escorted Defendant out of the store and to the front sidewalk. Tr. at 24-25; Gov't Ex. 1 at 18:43:35 – 18:43:50. At the time, Defendant was wearing a surgical medical mask under his chin. Tr. at 25; Gov't Ex. 1 at 18:43:41 – 18:47:08. Officer Echols asked Defendant if he had anything with his name on it. Tr. at 25-26. Defendant said he had a credit card in his pocket. Tr. at 26, 47.

12.     Officer Echols reached into Defendant's front pockets and located the credit card. Tr. at 26-27, 48; Gov't Ex. 1 at 18:44:17 – 18:44:21.  According to Officer Echols, a small baggie containing a white, powdery, crystal-like substance "was attached . . . or stuck to" the credit card. Tr. at 27-28, 49-51; Gov't Ex. 1 at 18:44:19 – 18:44:21.  At no time while Officer Echols searched through Defendant's pockets to retrieve the credit card did Defendant, who appeared to be leaning against a pallet of water, physically resist the officer's actions.  Gov't Ex. 1 at 18:44:09 – 18:44:43.

13.     Defendant told Officer Echols the substance was not a big deal and was for personal use.  Tr. at 27.  Based on his training and experience, Officer Echols believed the baggie contained a controlled substance.  Tr. at 27-28, 49.  Defendant was placed under arrest for possessing a controlled substance, placed in Officer Echols's patrol car, and transported to IPD.  Tr. at 28-30, 49; Gov't Ex. 1 at 18:47:07 – 18:48:04.

14.     Pursuant to IPD's policy, an officer is authorized to tow a vehicle left on private property if the driver is taken into custody, the vehicle is left unattended, and the vehicle's owner or other responsible party cannot take immediate custody of the vehicle.  Gov't Ex. 2 at 4.  If an officer has a vehicle towed, IPD policy requires an inventory search be conducted.  Gov't Ex. 2 at 2.

15.      Officer Echols had Defendant's truck towed because it was on private property and parked at a gas pump, Defendant was taken into custody, and no one was present to take possession of it.  Tr. at 30-32, 51; Gov't Ex. 2 at 4.  Before the truck was towed, its contents were inventoried. Tr. at 31-33.  During the inventory search, a firearm was located and seized.  Tr. at 33.[10]  As a result, Defendant was charged in this matter with being a felon in possession of a firearm.  Doc. 1.

---

[10] Defendant's motion indicates ammunition was also located and seized.  Doc. 21 at 6.  But no evidence was presented indicating ammunition was found.

## III.  DISCUSSION

In his motion to suppress, Defendant argues law enforcement did not have reasonable suspicion to stop him.  Doc. 21 at 1, 3-5.  Defendant further contends Officer Echols did not have reasonable suspicion to believe Defendant was armed and dangerous, and therefore, the frisk violated his Fourth Amendment rights.  *Id*. at 1, 3-5.  Defendant also maintains law enforcement's use of handcuffs was unjustified.  *Id*. at 3-4.  Defendant asserts "the substance in the baggie, of purported cocaine, firearm, and ammunition in the firearm" and "all incriminating statements" must be suppressed as the fruit of the Fourth Amendment violations.[11]  *Id*. at 5-6.

The Government contends the collective knowledge of IPD officers was sufficient to justify the investigative stop of Defendant and the frisk for weapons.  Doc. 24 at 3.  The Government also argues that the use of handcuffs was justified for officer safety reasons.  *Id*. at 6.

### A.  Stop of Defendant

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  Whether the Fourth Amendment is implicated depends on the nature of the encounter between law enforcement and a citizen.  *See United States v. Mendenhall*, 446 U.S. 544, 553-55 (1980); *Terry v. Ohio*, 392 U.S. 1, 15-19 (1968).  The Eighth Circuit recognizes three types of police-citizen encounters: a consensual encounter, a *Terry* stop, and a full-scale arrest.  *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988).[12]  Relevant to the pending motion to suppress, a brief investigative, or *Terry*, stop is permitted when law enforcement

---

[11] The only statements Defendant's motion to suppress references is Defendant "admit[ing] [his] possession of the firearm seized from his truck" and  his statement "that he has been getting high for sixteen years."  Doc. 21 at 3-4. Because no other statements are identified, the Court presumes Defendant moves to suppress the foregoing statements.

[12] Neither party argues the encounter between law enforcement and Defendant was consensual.  In fact, the Government describes the encounter as an investigatory stop.  Doc. 24 at 3-4.

has reasonable, articulable suspicion that the person stopped previously committed a crime, is engaged in criminal activity, or is about to engage in criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *United States v. Slater*, 979 F.3d 626, 629-30 (8th Cir. 2020); *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)).

    **(1)**       **Reasonable Suspicion Standard**

Reasonable suspicion does not require "absolute[] certain[ty];" rather, an officer must observe "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at 27-30. Reasonable suspicion requires more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause. *Kansas v. Glover*, 140 S. Ct. 1183, 1187-88 (2020); *United States v. Sanchez*, 955 F.3d 669, 674-75 (8th Cir. 2020). Further, the likelihood of criminal activity necessary to establish reasonable suspicion "falls considerably short of [that necessary to] satisfy[] a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted).

To determine if officers have reasonable suspicion, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citation omitted); *see also Arvizu*, 534 U.S. at 273. Courts consider "what the officer reasonably knew at the time, rather than assessing the existence of reasonable suspicion with the vision of hindsight." *Slater,* 979 F.3d at 629 (internal quotations and citation omitted). When assessing the overall level of suspicion, courts may not view individual elements of suspicion in isolation but must view the elements in context and give due weight to the officer's inferences. *Sanchez,* 955 F.3d at 675. The Government must prove "the officer had reasonable suspicion that criminal activity was afoot, not that the subject of the stop was actively engaged in a crime." *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016).

### (2)    Reasonable Suspicion of Criminal Activity

Before approaching Defendant, Officer Echols knew Defendant had been rummaging through the bed of another pickup truck in a motel parking lot where vehicle break-ins had been previously reported. While rummaging through the truck's bed, Defendant was wearing a surgical mask, and his truck's license plates were covered with duct tape. Additionally, Defendant's truck was registered at an address known for suspicious and criminal activities, and stolen vehicles had been recovered from the address.

Officer Echols described Defendant's behavior as "car prowling."[13] In his experience, car prowling is often related to breaking into and/or stealing vehicles. However, Detective Pfeiffer, who observed Defendant at the Staybridge Motel parking lot and followed him to QuikTrip, did not see Defendant break into or steal a vehicle.

Nevertheless, courts, including this one, have held law enforcement does "not have to observe the equivalent of direct evidence of a particular specific crime in order to detain a lawfully stopped individual to investigate where there is reasonable suspicion of criminal activity on his part." *United States v. Pack,* 612 F.3d 341, 357 (5th Cir. 2010); *see also United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012); *United States v. Fields*, No. 14-00017-01-CR-W-HFS, 2014 WL 5147610, at *4 (W.D. Mo. Sept. 10, 2014), *report and recommendation adopted*, 2014 WL 5171951 (W.D. Mo. Oct. 14, 2014), *aff'd*, 832 F.3d 831 (8th Cir. 2016); *United States v. Noonan*, No. 12-CR-1016-LRR, 2013 WL 500828, at *4 (N.D. Iowa Feb. 11, 2013), *aff'd,* 745 F.3d 934 (8th Cir. 2014).

When viewing the totality of the circumstances, Officer Echols reasonably believed criminal activity may be afoot. Although not mentioned by the parties, Defendant may have been engaged

---

[13] The Government does not cite – and the Court is unable to locate – a statute or ordinance criminalizing car prowling.

in tampering in the second degree. An individual commits the offense of tampering in the second degree if he "[t]ampers with property of another for the purpose of causing substantial inconvenience to that person or to another." *State v. Ahart*, 609 S.W.3d 512, 515 (Mo. Ct. App. 2020) (citing Mo. Rev. Stat. § 569.090.1(1)). "[T]o tamper with a motor vehicle may be many things" and can span from serious to not serious and major to minor. *Id*. at 517 (quoting *State v. Hale*, 463 S.W.2d 869, 872 (Mo. 1971)). The offense of tampering requires "some contact with the property, initiated by the defendant, or some effect on the condition or use of the property, however minimal." *Id*. Damage to another's property is not required to be convicted of tampering. *Id*. (citing *State v. Orton*, 178 S.W.3d 589, 592 (Mo. App. E.D. 2005)). Tampering in the second degree is a class A misdemeanor. Mo. Rev. Stat. § 569.090.3.[14]

Based on law enforcement's observations of Defendant rummaging through another's truck while wearing a mask and with his license plates covered with duct tape, the information known to the officer at the time, and in light of his experience, the undersigned finds Officer Echols had a reasonable, articulable suspicion that criminal activity may be afoot. Therefore, the undersigned recommends the Court find the initial investigatory stop of Defendant was lawful.

---

[14] In addition to the foregoing, Defendant's failure to display his license plates may have violated Missouri law. "No motor vehicle . . . shall be operated on any highway of this state unless it shall have displayed thereon the license plate or set of license plates issued by the director of revenue or the state highways and transportation commission . . . ." Mo. Rev. Stat. § 301.130.5. "Each such plate shall be securely fastened to the motor vehicle or trailer in a manner so that all parts thereof shall be plainly visible and reasonably clean so that the reflective qualities thereof are not impaired." *Id*. The failure to comply with section 301.130 is an infraction offense. Mo. Rev. Stat. § 301.440

While this matter does not involve a traffic stop, the Court observes "[a]ny traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Milk*, 66 F.4th 1121, 1131 (8th Cir.), *cert. denied*, 144 S. Ct. 239 (2023) (citation omitted). Even more relevant to this matter, the Eighth Circuit has found law enforcement had probable cause to initiate an investigatory stop when the defendant's license plate was not plainly visible. *United States v. Harris*, 617 F.3d 977, 979 (8th Cir. 2010); *see also United States v. Lindsey*, 43 F.4th 843, 847-48 (8th Cir. 2022) (finding that failure to display a license plate provided an officer with probable cause to detain a vehicle and its passenger). Defendant driving his truck with concealed license plates as he arrived at Quik Trip is one of the many factors the Court must consider when assessing the overall level of suspicion.

**B.      Frisk of Defendant**

To protect citizens from unwarranted government intrusion, the Fourth Amendment's reasonableness requirement generally requires police officers obtain a judicial search warrant, issued only upon a showing of probable cause, before conducting a search. *See Riley v. California*, 573 U.S. 373, 381-83 (2014) (citations omitted). A protective search, or frisk, of an individual for weapons is "unquestionably a search and seizure for Fourth Amendment purposes." *United States v. Dortch*, 868 F.3d 674, 678 (8th Cir. 2017). The Eighth Circuit has observed that "[b]eing stopped and frisked on the street is a substantial invasion of an individual's interest to be free from arbitrary interference by the police." *Hughes*, 517 F.3d at 1018 (citations omitted).

A frisk or protective pat down for weapons does not require a warrant if law enforcement "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 24); *United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (citation omitted). The officer does not have to be certain the individual is carrying a weapon. *Terry*, 392 U.S. at 27. But there must be articulable and specific facts as to dangerousness to justify a frisk for weapons. *Hughes*, 517 F.3d at 1016.

To ascertain whether an officer reasonably believes an individual is armed and dangerous, courts examine the totality of the circumstances. *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (quoting *Arvizu*, 534 U.S. at 273). Courts consider several factors, including, but not limited to, the time at which the contact takes place, the suspected party's location, a party's behavior upon becoming aware of law enforcement's presence, the party's prior criminal record, and information about or observations of the party carrying a firearm. *Id.* at 877-78; *see also United States v. Houston*, 920 F.3d 1168, 1172-73 (8th Cir. 2019); *United States v. Scott*, 818 F.3d 424, 431

(8th Cir. 2016). These factors are "considered together with the inferences and deductions made by the officer." *Davison*, 808 F.3d at 330 (citation omitted).

### (1)     Facts Surrounding Frisk

As the Government correctly states in its brief (Doc. 24 at 4), for an officer to conduct a frisk for weapons, the officer must "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *United States v. Davison*, 808 F.3d 325, 330 (8th Cir. 2015) (quoting *Sibron v. New York*, 392 U.S. 40, 64 (1968)). The Government argues Officer Echols had a reasonable suspicion that Defendant was armed and dangerous. Doc. 24 at 5-6. In support, the Government identifies the following facts: Defendant was wearing a surgical mask over his face and operating a truck with both license plates covered, Defendant was rummaging in the bed of another truck, vehicle thefts and break-ins were common in the area where Defendant was observed, and the truck's license plate was linked to an address with complaints of suspicious activity. *Id*. at 5.

### (2)     *United States v. Davison*

The Government contends the facts in this matter are similar to the circumstances in *Davison*. *Id*. at 5-6. In *Davison*, witnesses reported two individuals – one later identified as the defendant – were doing "donuts" in a pickup truck in a commercial parking lot and then parked the truck in the lot. 808 F.3d at 327. Police discovered the truck had been reported stolen. *Id*. After obtaining descriptions of the two individuals, law enforcement, who were in the area investigating a homicide, surveilled a nearby alley and the neighborhood. *Id*. One officer observed two individuals who matched the provided descriptions. *Id*. at 328. When the individuals noticed the patrol car, they avoided eye contact with the officer and changed their walking route. *Id*. The officer, who was aware of recent shootings in the area, including one that targeted police, continued to canvass the area looking for others who matched the descriptions. *Id*. Later, he again saw the same two individuals, and he drove around the block twice to further observe them. *Id*. The officer

noticed the individuals never broke stride and repeatedly glanced at his patrol car but quickly averted their eyes. *Id*. After they walked through the yard of a known "drug house," the officer stopped the individuals and immediately frisked them. *Id*.

The Eighth Circuit found law enforcement had reasonable suspicion to believe the defendant was armed and dangerous. *Id*. at 330. In reaching this conclusion, the Court noted police suspected the defendant of stealing a car, and when officers "encounter suspected car thieves, they also may reasonably suspect that such individuals 'might possess weapons.'" *Id*. at 330 (quoting *United States v. Hanlon*, 401 F.3d 926, 929 (8th Cir. 2005)). In addition, the Eighth Circuit considered the officer's observation of the defendant and his companion "walk[ing] through the yard of a known drug house in a high-crime area where recent shootings had occurred, including one that targeted police officers." *Id*.

The record before the Court is much different than the facts in *Davison*. In *Davison*, law enforcement received information indicating the defendant was driving or riding in a stolen vehicle. *Id*. at 327. Here, law enforcement did not suspect Defendant of stealing a vehicle. In fact, once dispatch ran Defendant's truck's license plates, law enforcement knew the truck he was driving was not stolen. Further, there was no evidence that law enforcement believed Defendant had broken into or stolen the vehicle observed at the Staybridge motel.

In *Davison*, law enforcement observed the defendant and his companion walking through a high crime neighborhood where recent shootings, including one that targeted police, had occurred. *Id*. at 328. And the individuals walked through the yard of a known drug house. *Id*. Here, Defendant was inside a QuikTrip. While Officer Echols testified vehicle thefts and break-ins occurred in the area, there was no evidence that shootings had occurred near Defendant's location. Further, Officer Echols did not observe Defendant for any length of time. He simply walked into QuikTrip and immediately contacted Defendant followed closely by a frisk for weapons. There is no evidence

13

that Defendant attempted to evade or elude the officer or tried to avoid him in any way. He did not avert his eyes or try to change his direction or position within the store. There is no evidence that Defendant was acting in a dangerous or aggressive manner inside the store.

In *Davison*, Defendant and his companion reacted when they became aware of police's presence. *Id.* They averted their eyes, changed their route, and repeatedly glanced in law enforcement's direction. *Id.* In this matter, no evidence was presented about Defendant's response when he first became aware of Officer Echols. And once contact was made, Defendant cooperated with Officer Echols and continued cooperating throughout their entire interaction.

### (3) Reasonable Suspicion that Defendant Was Armed and Dangerous

Regardless of the dissimilarities between this matter and *Davison*, the Government has not established particular facts from which an officer could reasonably infer Defendant was armed and dangerous. While Defendant was wearing a surgical mask over his face and operating a truck with both license plates covered, no evidence was presented indicating these behaviors suggest an individual is armed and dangerous.

Defendant was observed rummaging through the bed of another truck. Law enforcement did not see Defendant take anything from or break into the truck. The Government points out the Eighth Circuit has found officers may reasonably believe "suspected car thieves . . . might possess weapons." *Davison*, 808 F.3d at 330 (citation omitted). But Defendant was not seen operating a stolen vehicle or even attempting to steal or break into a vehicle. In fact, the only vehicle officers observed Defendant operating was confirmed to be his own.

Additionally, Defendant was not suspected of stealing a vehicle. Rather, the evidence establishes law enforcement suspected Defendant of car prowling. No evidence was presented demonstrating law enforcement suspected Defendant of stealing vehicles. Because law enforcement did not suspect Defendant stole a vehicle, the Government cannot rely on "suspected car

thieves . . . might possess weapons" to establish Officer Echols reasonably believed Defendant was armed and dangerous. The Government does not cite authority indicating car prowling (including tampering in the second degree) or failing to properly display license plates is a dangerous crime that would cause law enforcement concern that Defendant may be armed and dangerous.[15]

The Government also focuses on Defendant's suspected car prowling that occurred in a parking lot where break-ins were common. But the Government did not present evidence that law enforcement believed Defendant was engaged in a dangerous criminal activity, such as drug transactions, vehicle theft, or robbery. *See United States v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010) (recognizing that "[a] suspicion on the part of police that a person is involved in a drug transaction supports a reasonable belief that the person may be armed and dangerous because weapons and violence are frequently associated with drug transactions.") (citation omitted); *Hanlon*, 401 F.3d at 929 (observing officers may reasonably believe suspected car thieves "might possess weapons.") (citations omitted); *United States v. Ward*, 23 F.3d 1303, 1306 (8th Cir. 1994) (observing "many (if not most) robbers are armed," law enforcement could reasonably infer a robbery suspect was armed and dangerous) (citation omitted).

In addition, no evidence was offered regarding dangerous criminal activity and/or shootings near the QuikTrip were Officer Echols contacted Defendant. The Court also notes the contact was made inside the convenience store and while it was still daylight. These circumstances do not support a reasonable inference that Defendant was armed and dangerous.

---

[15] As noted above, the offenses of tampering and failure to display license plates are either misdemeanor or infraction offenses. Although the Eighth Circuit has declined to adopt a *per se* rule that police may never stop an individual to investigate a completed misdemeanor, it held on the facts of the case that the governmental interest in investigating a prior misdemeanor trespass did not outweigh an individual's freedom to be free from "arbitrary interference" by the police stopping and frisking the defendant. *United States v. Hughes*, 517 F.3d 1013, 1018 (8th Cir. 2008). According to the Eighth Circuit, "[t]here may be cases where a *Terry* stop is justified to investigate a completed trespass, such as where there is a strong threat to public safety." *Id.* Similar to *Hughes*, there was no evidence adduced that Defendant presented a "strong threat to public safety."

Further, law enforcement did not conduct any investigation once contact was made with Defendant and before he was frisked. The entire contact between Officer Echols and Defendant inside QuikTrip lasted, at most, one minute and sixteen seconds. Gov't Ex. 1 at 18:42:19 – 18:43:35. Per Officer Echols's testimony, he told Defendant the reason for the contact and asked Defendant if he was armed. He then frisked Defendant. Although he found no weapons, Officer Echols found a cookie, which he believed was stolen merchandise. He then handcuffed Defendant and led him out of the store.

Officer Echols did not testify about any investigation he conducted before frisking Defendant. And given the time the contact occurred inside QuikTrip, any investigation would have been cursory, at best. *See El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457-58 (8th Cir. 2011) (finding the frisk of the defendant was unlawful because, among other things, the individual was suspected of committing a non-dangerous crime of "theft by swindle" and law enforcement "failed to conduct even the most basic investigation into the facts prior to handcuffing and frisking [the individual], which occurred less than a minute after [the officer] entered the store.").

The Government did not present any evidence that Defendant panicked, appeared nervous, acted in a threatening manner, or fled when he saw Officer Echols. Rather, Officer Echols testified Defendant was cooperative. While dispatch indicated suspicious activity had occurred on Defendant's street, dispatch did not indicate or provide information from which Officer Echols could reasonably infer Defendant may be armed and dangerous. Officer Echols was familiar with Defendant's address, including the recovery of stolen items and vehicles and individuals fleeing from law enforcement. But he did not testify about dangerous criminal activities occurring at the property. Additionally, he had no prior interactions with Defendant and none of the prior complaints about the address involved Defendant or a particular person. *See id.* at 457-58 (observing the

information provided by dispatch did not indicate the individual "could be armed and dangerous" and noting the individual's behavior was "calm and cooperative").[16]

Based on the evidence presented and upon examination of the totality of the circumstances presented in this matter, the undersigned finds Officer Echols failed to point to articulable and specific facts from which he reasonably inferred Defendant was armed and dangerous. Accordingly, the undersigned recommends the Court conclude the frisk of Defendant violated his Fourth Amendment rights.

## C.    Handcuffing Defendant

Defendant also contends law enforcement's use of handcuffs was unlawful. Doc. 21 at 3-5. During his frisk of Defendant, Officer Echols found a large cookie wrapped in cellophane in the front pocket of Defendant's hoodie. He then handcuffed Defendant for officer safety, to prevent Defendant from leaving, and to await the arrival of additional officers. He did not testify that he handcuffed Defendant for suspected theft of the cookie. According to Officer Echols, Defendant was "detained" at that time. There is no evidence in the record that Defendant was formally arrested at that time.

Based on the above-referenced testimony of Officer Echols, the Court analyzes the use of handcuffs during a *Terry* stop. "Officers may use handcuffs during a *Terry* stop if they have 'some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case.'" *United States v. Bonilla*, 86

---

[16] Officer Echols provided two additional reasons for frisking Defendant: (1) he "sustained life-altering injuries not frisking people, not detaining people appropriately," and (2) it was his "practice" to frisk an individual suspected of criminal activity inside a store. Tr. at 20-21. The Government neither argues nor cites authority supporting an argument that Officer Echols's additional reasons for the frisk provide proper justification for law enforcement to reasonably infer Defendant was armed and dangerous. *See* Doc. 24. The Court would observe, however, that a general "practice" of frisking all persons inside stores who are suspected of engaging in possible criminal behavior does not comply with the Fourth Amendment and the need to show individualized articulable and specific facts as to dangerousness sufficient to justify a frisk for weapons.

F.4th 1196, 1199 (8th Cir. 2023) (quoting *El-Ghazzawy*, 636 F.3d at 457). Because "handcuffs constitute 'greater than a de minimus intrusion,' their use 'requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in [believing] that the action taken was appropriate.'" *Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) (quoting *El-Ghazzawy*, 636 F.3d at 457). The Eighth Circuit has held "handcuffing 'absent any concern for safety' violates" *Terry*. *Id*. (quoting *El-Ghazzawy*, 636 F.3d at 460).

Officer Echols knew Defendant was not armed and dangerous because he frisked him for weapons and found none. Thus, the issue before this Court is whether preventing Defendant from leaving and waiting for the arrival of other officers provided legitimate purposes for handcuffing Defendant. *See Bonilla*, 86 F.4th at 1199. According to Officer Echols, Defendant was cooperative during the encounter. Further, the Court heard no evidence that Defendant exhibited any behavior that he may flee.

Because there is no evidence supporting the officer's reasons for handcuffing Defendant, the Court cannot find the officer had a reasonable belief that extraordinary circumstances necessitated handcuffing Defendant. *El-Ghazzawy*, 636 F.3d at 460 (finding "it is well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances.") (citation omitted). Therefore, the Court recommends a finding that handcuffing Defendant in light of the particular facts of this case violated his Fourth Amendment rights.

**D.    Exclusionary Rule**

Finally, Defendant argues the baggie with the controlled substance, firearm, ammunition in the firearm, his "admitted possession of the firearm seized from his truck," and his statement that he "has been getting high for sixteen years" should be suppressed due to law enforcement violating his Fourth Amendment rights. Doc. 21 at 3-6. "Evidence obtained in violation of the Fourth

18

Amendment may be subject to exclusion." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007) (citation omitted); *see also United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *United States v. Calandra,* 414 U.S. 338, 347 (1974)). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Riesselman*, 646 F.3d at 1078 (quoting *Segura v. United States,* 468 U.S. 796, 804 (1984)). "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)).

Evidence should be excluded only if the "illegality is at least a but-for cause of obtaining the evidence." *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007). To determine whether challenged evidence is fruit of an illegal search, "the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *Marasco*, 487 F.3d at 547 (citations omitted). "Once the defendant comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government." *Riesselman*, 646 F.3d at 1079 (citing *Alderman v. United States,* 394 U.S. 165, 183 (1969)). "In other words, the government must show the evidence obtained after the illegal search was [obtained] by [a different] means sufficiently distinguishable to be purged of the primary taint." *Id*. (citing *Wong Sun,* 371 U.S. at 488).

At 6:42 p.m., Officer Echols entered QuikTrip. Shortly thereafter, he frisked Defendant, finding a cookie in the front pocket of Defendant's hoodie. The frisk, as explained above, was not supported by reasonable suspicion that Defendant was armed and dangerous. Because he found the cookie on Defendant's person, Officer Echols handcuffed and detained Defendant.

At 6:43 p.m., Officer Echols escorted Defendant outside QuikTrip. Once outside, Officer Echols asked Defendant if he had anything displaying his name. Defendant said he had a credit card in his pocket. At 6:44 p.m., Officer Echols located the credit card in a front pocket of Defendant's pants. Attached to the credit was a small baggie containing what Officer Echols believed was a controlled substance. At that point, Defendant was arrested for possession of a controlled substance. He was then transported to IPD where he was questioned, and he made statements about the firearm and using controlled substances. Because he was arrested, Defendant's truck had to be towed, requiring an inventory search during which a firearm was found.

Based on the foregoing record, the unlawful frisk and handcuffing of Defendant were at least the but-for cause of law enforcement obtaining the challenged evidence. Because there is a factual nexus between the constitutional violations and the evidence later discovered, the evidence is the derivative of an unlawful search and seizure. Thus, the Government must show the evidence obtained after the illegal search and seizure was acquired "by means sufficiently distinguishable to be purged of the primary taint." *Riesselman*, 646 F.3d at 1079 (citing *Wong Sun,* 371 U.S. at 488).

In its opposition to the pending motion to suppress, the Government did not address or otherwise explain why the challenged evidence should not be suppressed because of the illegal search and seizure. *See* Doc. 24. Further, there is no evidence showing the challenged evidence was obtained in a sufficiently distinguishable manner to purge the primary taint of the unlawful search and seizure. *See United States v. Sledge*, 460 F.3d 963, 966 (8th Cir. 2006) ("When a defendant commits a new and distinct crime during an unlawful detention, the Fourth Amendment' exclusionary rule does not bar evidence of the new crime.") (citation omitted); *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006) (observing sufficient attenuation may dissipate the taint of an unlawful seizure); *see also United States v. Barnum*, 564 F.3d 964, 971 (8th Cir. 2009) (holding

voluntary consent "must be an independent lawful cause of the search" to purge the taint of an unlawful seizure).

Because the undersigned recommends the Court find Defendant's Fourth Amendment rights were violated and the record does not demonstrate the challenged evidence was acquired "by means sufficiently distinguishable to be purged of the primary taint," the undersigned recommends the Court grant Defendant's motion and suppress the controlled substance, firearm, ammunition in the firearm, and Defendant's statements about possessing the firearm and drug use as fruits of the poisonous tree.

## IV.    CONCLUSION

Based on the foregoing, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order granting Defendant's Motion to Suppress Evidence and Statements (Doc. 21).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: March 29, 2024                    _/s/ W. Brian Gaddy_____
                                         W. BRIAN GADDY
                                         UNITED STATES MAGISTRATE JUDGE